UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
Sheena DeLaurencio,

                      Plaintiff,

-against-

Brooklyn Children's Center,
SUPERINTENDENT,

                      Defendant.
-----------------------------------------------------------------x

**MEMORANDUM & ORDER**

13-cv-4912 (SLT)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 0 1 2015 ★

BROOKLYN OFFICE

**TOWNES, United States District Judge:**

*Pro se* Plaintiff Sheena DeLaurencio brings this action against her former employer, Brooklyn Children's Center ("BCC"), alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Presently before this Court is BCC's motion to dismiss for failure to state a claim upon which relief can be granted, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, BCC's motion is GRANTED.

**STANDARD OF REVIEW**

To survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Bell Atl.Corp v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). While detailed factual allegations are not required, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* The court's inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996). A court considering a motion to dismiss must follow the two-pronged approach set forth by the Supreme Court in *Twombly*, and "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. If the factual allegations are sufficiently well-pleaded, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

The Court's consideration is generally limited to the four corners of the complaint and "documents attached to the complaint as an exhibit or incorporated in it by reference." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (internal citation omitted). Additionally, the Court may consider administrative filings and decisions, such as the EEOC charge, as "they are public documents filed in state administrative proceedings, as well as because they are integral to plaintiff's claims." *Morris v. David Lerner Assoicates*, 680 F.Supp.2d 430, 436 (E.D.N.Y. 2010). Because DeLaurencio proceeds *pro se*, the complaint must be construed liberally and read to "raise the strongest arguments that [it suggests]." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation omitted).

## BACKGROUND

The following facts are drawn from DeLaurencio's original and amended complaints and are deemed true for purposes of this motion to dismiss.[1]

---

[1] "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n. 4 (2d Cir. 1998). However, DeLaurencio's *pro se* status obliges this Court to construe her submissions liberally and interpret them to raise the strongest arguments that they suggest. To this end, the Court reads DeLaurencio's original and amended complaints together. *See Nichairmhaic v. Dembo*, No. 3:13–CV–01184 (JCH), 2013 WL 6385041, at *1 n.1 (D. Conn. Dec. 4, 2013).

2

1. **Climate at BCC**

Sheana DeLaurencio, a West-Indian woman, began working for BCC on May 22, 1997, as a Safety and Security Officer. (Doc. No. 16, Second Amended Complaint ("SAC"), ¶¶ 8-9.) BCC is a health care and community residence program for children below the age of 18, operated by the New York State Office of Mental Health. (SAC ¶ 7.) DeLaurencio alleges that while she was employed at BCC, she was "subjected to a vicious and pervasive pattern of discriminatory harassment" at the hand of her co-workers, mainly Sergeant Anthony Inganamort ("Inganamort"), because of her race, sex, and national identity as a black West Indian female. (SAC ¶ 12.) According to DeLaurencio, the harassment "was ongoing since 1997, and . . . never stopped." (Doc. No. 9, First Amended Complaint ("FAC"), at p. 7, ¶ 8.)

2. **1997 Sexual Harassment by Gallo and 1998-2000 Harassment by Inganamort**

DeLaurencio alleges that in December of 1997, one of her supervisors, Chief Gerald Gallo, asked her to engage in sexual intercourse, and after she turned Gallo down, she "was subjected to reprisals and discriminatory treatment." (SAC ¶¶ 14-15.) On December 22, 1997, Gallo unjustifiably reprimanded DeLaurencio for being out of uniform and, on December 28, 1997, he and Inganamort accused DeLaurencio of stealing an empty basket and forced her to return home to retrieve the basket. (SAC ¶ 15.) During this time, she was repeatedly called "stupid" and harassed, and the harassment was "infused with racial and xenophobic animus, sexual innuendos and sexist statements." (*Id.*)

DeLaurencio alleges that "[s]ometime in 1998," Inganamort told her that "he was going to break [her] down," and has been on this "mission" ever since. (SAC at p. 52.) On January 18, 2000, Gallo and Inganamort reassigned one of DeLaurencio's cases to another officer, "making it appear that [she] was not capable of working a case through the arrest." (SAC ¶ 16.) On April

17, 2000, in a conversation with another officer, Inganamort referred to DeLaurencio as a "stupid woman," and said that DeLaurencio came to America "to get a good job and a house and is still complaining." (SAC ¶ 18.)

In April 2000, someone pinned a newspaper clipping, which depicted a group of children, including a black boy with dreadlocks and a number of white children, to a bulletin board to which Inganamort and others had access. (SAC ¶ 20.) In June 2000, DeLaurencio found several purportedly offensive newspaper clippings in the office. First, Inganamort had a picture in his office of a parrot with the head of another black female officer, Officer Leathers, superimposed over it. (SAC ¶ 21.) Second, Inganamort taped up, near DeLaurencio's workspace, a photocopy of a page from a dictionary, with an arrow drawn on it pointing from the word 'ass' to the word 'assault,' and with the word 'stupid' in the definition of 'ass' underlined. (SAC ¶ 22, Ex. 1.) Finally, a newspaper clipping which depicted a dead black man with an eye gouged out was posted to the bulletin board. (SAC ¶ 23.) On October 13, 2000, Inganamort accused DeLaurencio of "screwing around" with Jerry DeWitt, a union representative. (SAC ¶ 26.)

### 3. 2000 EEOC Charge

In 2000, DeLaurencio filed complaints with BCC and a Discrimination Charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Inganamort and other co-workers verbally and physically abused her and intimidated her on account of her sex, race, and national origin. (SAC ¶ 28.) Approximately two months after filing her 2000 EEOC charge, DeLaurencio contends that she was retroactively given "unsatisfactory" performance evaluations in retaliation for filing the charge. (SAC ¶ 29.) In January 2001, while the charge was pending, Inganamort denied DeLaurencio a lunch break. (SAC ¶ 30.) DeLaurencio's EEOC charge was

4

settled in mediation in 2001 and "the harassment against [P]laintiff sporadically abated" but the effect of the settlement "was short-lived." (SAC ¶ 32.)

4. **Post 2000 EEOC Charge Conduct**

In May 2001, Inganamort allegedly took pictures of DeLaurencio with his cell phone while she was using a facility vehicle and then demanded that she return the keys to the vehicle. When she did, he pushed her aside and sped off in the car. (SAC ¶ 33.) On June 18, 2001, DeLaurencio complained to her manager that she felt "very uneasy that the same supervisor who harassed [her] for the past three years, who forced [her] to seek help from the [EEOC], and without regards [*sic*] to the signed agreement made on [her] behalf between the EEOC [*sic*] . . . still to the best of his ability . . . [made] the work place very uncomfortable." (SAC at p. 56.) She contends that despite reporting the incident involving the facility car keys to BCC management, no action was taken against Inganamort by BCC. (SAC ¶ 33.)

DeLaurencio makes no allegations that Inganamort harassed her in 2002. Inganamort was promoted from sergeant to acting chief of their department in 2003, at which point DeLaurencio's contact with Inganamort "was minimal." (SAC ¶ 35.) However, DeLaurencio alleges that as a result of BCC's failure to take action against Inganamort, other members of the staff began to take cues from Inganamort's behavior and "engaged in sexual innuendo, sexual harassment, unwelcome touching, and offensive comments without any restrictions." (SAC ¶ 34.)

For example, Sergeant Harper, visited DeLaurencio's home with a union-related document, and, while there, allegedly touched her buttocks and said "Your buttocks looks nice and big and fat." (*Id.*) Despite DeLaurencio's insistence that Sergeant Harper stop, he again

5

inappropriately touched her on another occasion at the BCC facility and, when she opposed, screamed that she was a "bitch." (*Id.*)

In 2004, DeLaurencio was promoted to sergeant and Inganamort returned to his duties as a sergeant. (SAC ¶¶ 35-36.) Although they did not work together, "where their tours overlapped," Inganamort allegedly resumed his harassment. (SAC ¶ 37.) On July 9, 2004, a footstool and boxes blocked DeLaurencio's access to her filing cabinet. (SAC ¶ 38.) DeLaurencio implies that Inganamort left the items there. On November 26, 2004, she found a picture of a black woman wearing a sleeveless shirt and a skirt on the sergeants' copy machine. (SAC ¶ 39.) When Inganamort went to retrieve the photocopy, DeLaurencio told him the image was offensive, and Inganamort replied that he was "sorry" and "just fooling around." (*Id.*) DeLaurencio complained about this incident to a supervisor but no corrective measures were taken. (*Id.*) On April 18, 2005, Inganamort left a cartoon on DeLaurencio's desk which depicts two men dressed in office attire standing by a water cooler in a field of grass, with two bears watching the office workers with the words "Sometimes I'm actually embarrassed by how easy it can be" in a text bubble above one of the bears. (SAC ¶ 40, Ex. 4.)

In 2005, DeLaurencio found various materials that she considered offensive in the sergeants' office area, although she does not allege who placed those materials. For example, on April 15, 2005 she found a chicken bone on top of her filing cabinet. (SAC ¶ 41.) On June 26, 2005, someone "defaced" DeLaurencio's image on some training materials by drawing on a mustache and beard. (SAC ¶ 42.) On July 17, 2005, she found two pennies inside of her lunch bag, "implying that she had engaged in voodoo." (SAC ¶ 43.) On August 3, 2005, someone placed a picture of the Virgin Mary in DeLaurencio's filing cabinet. (SAC ¶ 45.) Also in August 2005, someone posted a note to DeLaurencio's filing cabinet, which read "$500.00 ...

vehicle theft. Get the Point?? No?" (SAC ¶ 46, Ex. 9.) In 2005, someone broke the wings and heads off of DeLaurencio's ceramic angels and defaced the magnets on her filing cabinet. (SAC ¶ 47, Ex. 10.) She repeatedly complained to her supervisors about these incidents, to no avail. (SAC ¶ 48.)

Inganamort allegedly enlisted Sergeant Valentin to harass DeLaurencio. In July 2005, Inganamort and Valentin brought four mugs, which had insults such as "Warning. I hear voices and they don't like you" printed on them, into the office, allegedly to insult DeLaurencio's intelligence. (SAC ¶ 44.) On one occasion, Valentin gave DeLaurencio one of the mugs, which read "Stupid is not a crime. So you are free to go," and told her, "this is for you." (*Id.*) On February 12, 2006, Valentin left photographs of a naked female on the printer "for everyone to see." (SAC ¶ 49.) On March 26, 2006, Valentin left an incident report form on DeLaurencio's desk, on which he wrote "NOW IS THE TIME FOR BROWN COWS TO COME TO THE AIDE OF OUR CALF," a remark DeLaurencio believed was "obvious[ly]" derogatory towards black women. (SAC ¶ 50). Despite making complaints to BCC, no disciplinary actions were taken in response to any of this behavior. (*Id.*)

DeLaurencio makes no allegations of harassment between March 2006 and July 2007. At some point in 2006, Inganamort was suspended for a "lengthy period of time" for "using his personal camera to take photos of a female employee[, not DeLaurencio,] gyrating and bending over ... in the lobby of [BCC]." (SAC ¶ 51.) He returned to work in 2007. (*Id.*)

On July 20, 2007, DeLaurencio called in sick and Inganamort hung up the phone on her and failed to record the call, placing her in jeopardy of disciplinary action. (SAC ¶ 53.) In December 2007, Inganamort "tossed a visitor's list at [DeLaurencio]," and told her that he had no respect for her. (*Id.*) In February 2008, he threw her newspaper in the garbage. Someone

7

placed a newspaper clipping on her desk with the words "don't be evil" written on it, and another clipping which read: "Evil is like a weed. It may thrive for a while, but always dies." (SAC ¶ 54.) On February 7, 2008, Inganamort focused the facility's security cameras on DeLaurencio. (SAC ¶ 55.) In April 2008, Inganamort placed a newspaper clipping on her desk with words: "Envy is the sorrow of fools," and the next day, he called her a "big fat retard." (SAC ¶ 57.) On May 26, 2008, during the BCC's annual barbeque, after DeLaurencio wrapped up some food and put it in her personal bag to eat at home, Inganamort accused her of stealing food in front of the rest of the BCC staff. (SAC ¶ 58.) In June 2008, Inganamort allegedly taunted DeLaurencio with the results of his civil service exam, an exam which DeLaurencio had also taken but had not passed. (SAC ¶ 59.) DeLaurencio alleges that Inganamort did not subject white and Hispanic male officers that had similarly failed the exam to the same harassment. (*Id.*)

In April 2009, when DeLaurencio inquired about the whereabouts of one of their colleagues, Inganamort called DeLaurencio a "snitch," and said that "snitches get stitches." (SAC ¶ 61.) A few days later, Inganamort "aggressively threw a set of State vehicle keys . . . at [DeLaurencio]," which landed on a clipboard. (SAC ¶ 63, p. 51.) DeLaurencio perceived both incidents as threats of violence and reported them as "continued harassment in the workplace," to BCC Management. (SAC ¶¶ 64-65.) Inganamort wore a necklace with a pendant depicting a skull and crossbones, which DeLaurencio perceived as threatening. (SAC ¶ 67.) A supervisor noted that Inganamort's conduct was "unprofessional," but no other disciplinary actions were taken. (SAC ¶ 65.) Also in 2009, in addition to allegedly leaving a picture of Mickey Mouse on DeLaurencio's desk and taunting Plaintiff that her assignment was "Mickey Mouse stuff," Inganamort told DeLaurencio that "things will start happening to people around here, wait and see," before throwing a piece of paper at DeLaurencio. (SAC ¶¶ 66-67.) In June 2009, someone

left a dead cockroach in DeLaurencio's desk, her chair was saturated with fluid, and Inganamort called her "stupid." (SAC ¶¶ 67-70.) DeLaurencio again complained to management in a written memorandum entitled "Continued work place harassment," but no corrective actions were taken. (SAC ¶ 71.)

In January 2010, without any provocation, Inganamort allegedly forcefully pushed the chair DeLaurencio was sitting in, causing her to "jerk forward," while yelling at her to move. (SAC ¶ 72.) During this incident Inganamort told DeLaurencio she would "wind up like her friend Jerry DeWitt." (*Id.*) DeWitt had died just days earlier. (*Id.*) DeLaurencio perceived these comments to be threatening and reported them to BCC. Again, no action was taken by BCC. (*Id.*)

On February 1, 2010, DeLaurencio, purportedly "fearing for her physical safety, if not her life," filed a complaint with the NYPD. (SAC ¶ 74.) Additionally, she filed documents seeking to obtain an order of protection from Inganamort, but mistakenly went to Family Court, so no order was issued. (*Id.*) BCC was made aware of DeLaurencio's actions and suggested that Inganamort and DeLaurencio attend a conflict resolution session. (SAC ¶ 75.) Inganamort refused, and instead placed a photograph on DeLaurencio's desk with the caption "Conflict Resolution? What Could Happen Next." (*Id.*) The photograph depicts former New York Governor David Paterson, an African-American man, walking with his aide, David Johnson, also an African-American man, both wearing suits. (SAC at p. 58.) David Johnson was accused of domestic violence. (*Id.*)

### 5. Post 2010 EEOC Charge Events

DeLaurencio filed a complaint with the EEOC shortly thereafter, on February 19, 2010. (*Id.*) In May of 2012, DeLaurencio was transferred to a night shift at the Psychiatric Institute of

9

Manhattan as a result of downsizing at BCC. (SAC ¶ 79.) In January 2013, DeLaurencio applied for a "desirable" day shift that became available in Queens, but the position was instead given to Sergeant Fernandez, a non-African-American male. (*Id.*) DeLaurencio contends that "even after she left BCC, she was subjected to retaliatory treatment," in that she was denied access to BCC's parking facilities, while other ex-BCC employees were granted permission to leave their vehicles on BCC property. (SAC ¶ 80.)

### 6. Procedural History

On February 19, 2010, DeLaurencio filed an intake questionnaire with the EEOC, which included a detailed summary of her allegations of discrimination, harassment, and retaliation.[2] (SAC at p. 45.) In an introductory paragraph, the February 19, 2010 summary states that she previously filed a charge with the EEOC in 2000 which was resolved in mediation. She then sets out a detailed summary of many incidents which occurred between February 12, 2009 and February 17, 2010. (SAC at p. 49-51.)

On July 1, 2010, DeLaurencio filed a formal "Charge of Discrimination" with the EEOC, alleging discrimination based on retaliation, sex, and national origin.[3] (FAC at p. 12-13.) The charge states, in part:

---

[2] Although DeLaurencio's Second Amended Complaint describes the document filed with the EEOC on February 19, 2010 as a "Complaint," (Doc. No. 16, Second Amended Complaint, at 19.), it is titled "Equal Employment Opportunity Commission Intake Questionnaire," and the signature page of the form provides an option to check off "Box 1" or "Box 2," indicating a desire to file a formal charge. (Doc. No. 16, Second Amended Complaint, at 48.) DeLaurencio checked off "Box 1," which provided, "I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC." (*Id.*)

[3] BCC's moving papers consistently refer to DeLaurencio's second EEOC charge as being filed on June 21, 2010. (Doc. No. 26, Def. Memorandum in Support, at 7, 14.) However, a closer look at the document reveals that while DeLaurencio dated the form on June 21, 2010, her signature was not notarized until June 26, 2010. (Doc. No. 27, Def. Declaration in Support, Exhibit A, at 4.) Thus, for purposes of this motion this Court assumes that the charge was filed

10

> I, Sheena DeLaurencio, am an African-American female, 50 years of age, born in West Indies, having been employed by [BCC] from May 1997 through present. During approximately the last 12 months of this employment period, I had been, and continue to be, a victim of aggravated harassment, intimidation, attempted assault, and other misconduct perpetrated by one counterpart, Officer Anthony Inganamort, during routine work hours.

The charge details numerous incidents involving Inganamort and supervisors at BCC.

BCC submitted a response to the EEOC, addressing each of DeLaurencio's complaints on October 21, 2010. (Dkt. 27-2) DeLaurencio filed a rebuttal to BCC's statement on February 20, 2011, which states:

> Inganamort was always on my back from the start, however, on December 12, 1998 he stated to me that he was going to break me down. Ever since that comment [Inganamort] set out on a mission to according to his words [*sic*] break me down. I was harassed, verbally abused, intimidated[,] disrespected[,] assaulted, my right [*sic*] violated and discriminated against by [Inganamort] and [*sic*] Chief Krempasky not only violated my rights but it [*sic*] created a very hostile and toxic work environment for me.

(SAC at pp. 52-55.) In her rebuttal statement, DeLaurencio mentions an additional incident which occurred on May 26, 2008. (SAC a p. 52.) DeLaurencio repeats the 2009-2010 allegations listed in the February 19, 2010 summary, which are numbered "charge # 1" through "Charge # 8."

The EEOC issued DeLaurencio a Right to Sue letter on June 5, 2013, (Dkt. No. 27-3), and DeLaurencio timely filed the instant suit 90 days later, on September 3, 2013. DeLaurencio's First Amended Complaint and Second Amended Complaint were filed on November 26, 2013 and March 17, 2014, respectively, and allege six separate claims for relief. Claims one through three allege that DeLaurencio was subjected to discrimination and unequal treatment in violation of Title VII because of her sex, race, and national origin, respectively. The fourth claim alleges that she was subjected to a hostile work environment because of her race,

---

on July 1, 2010, which is the date on which the EEOC stamped the document as "received." (*Id.* at 3.)

11

sex and national origin in violation of Title VII. Claims five and six allege that DeLaurencio was subjected to retaliation and a "retaliatory hostile work environment" in violation of Title VII. BCC filed the instant motion on August 14, 2014, arguing that DeLaurencio failed to state a claim under Title VII. For the following reasons, that motion is granted and DeLaurencio's case is dismissed.

## DISCUSSION

### A. <u>Exhaustion</u>

"Exhaustion is ordinarily an essential element to a Title VII claim." *Williams v. New York City Housing Authority*, 458 F.3d 67, 70 (2d Cir. 2006). "An allegation not set forth in an administrative charge will be barred as unexhausted unless it is reasonably related to the allegations in the charge." *Hoffman v. Williamsville School Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) (summary order) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (superseded on other grounds)). Unexhausted claims are "reasonably related" where (1) "the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;'" (2) the plaintiff is "alleging retaliation by an employer against an employee for filing an EEOC charge;" or (3) "a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts*, 990 F.2d at 1402–03 (quotation and other citations omitted). EEOC charges are held to a "loose pleading" standard, and "frequently are filled out by employees without the benefit of counsel." *Id.* at 1402. "[T]heir primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Id.* "The purpose of the exhaustion requirement—namely, to encourage settlement of discrimination disputes through conciliation and voluntary compliance—would be defeated if

a plaintiff could litigate a claim not previously presented to the EEOC." *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 393 (E.D.N.Y. 2014). Thus, "[i]n this inquiry, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "[t]he central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both [the alleged and unalleged] bases." *Williams*, 458 F.3d at 70 (citations and internal alterations and quotation marks omitted).

Here, DeLaurencio's complaint contains a sprawling compendium of allegations dating back to 1997 involving numerous supervisors and coworkers. However, her EEOC charge expressly limits her claims to "approximately the last 12 months." Additionally, the EEOC charge expressly limits her complaint to "misconduct perpetrated by one counterpart, Officer Anthony Inganamort." (SAC at p. 12). In the two detailed summaries submitted in support of her charge, DeLaurencio lists incidents which took place between February 12, 2009 and February 17, 2010. (SAC at p. 49-51.) Although she mentions that she previously filed a charge with the EEOC in 2000, she provides this fact in an introductory paragraph, which appears to set out background information. DeLaurencio then sets out a number of incidents which took place in 2009 and 2010 in reverse chronological order. Upon of review of all of the materials submitted to EEOC, none of the materials even suggest that the EEOC should investigate incidents from a decade earlier or involving supervisors and coworkers other than Inganamort. Indeed, "even if a reasonable investigation would have uncovered the additional ... events, [DeLaurencio] unequivocally *cut off that investigation,* expressly limiting its scope to" the last 12 months involving 'one counterpart,' Inganamort. *Mount v. Johnson*, No. CV 12-CV-1276(KBJ), 2014 WL 1392334, at *11 (D.D.C. Apr. 10, 2014). By expressly limiting her EEOC

charge, DeLaurencio prevented the EEOC from investigating incidents perpetrated by other BCC employees and pre-dating the express cut-off date stated in the charge. Accordingly, the Court limits its consideration to events which occurred after February 2009 and involved Inganamort. Claims arising out the remainder of the incidents detailed in DeLaurencio's complaint are unexhausted.

### B. **Failure to State a Claim Under Title VII**

"It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). "Title VII is not a 'general civility code.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), *amended* (Dec. 22, 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see also Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."). "Work environments that are hostile for non-discriminatory reasons do not fall within the ambit of Title VII." *Thomas v. Bergdorf Goodman, Inc.*, No. 03 CIV. 3066 (SAS), 2004 WL 2979960, at *6 (S.D.N.Y. Dec. 22, 2004); *see also Magadia v. Napolitano*, No. 06 CIV. 14386(CM), 2009 WL 510739, at *17 (S.D.N.Y. Feb. 26, 2009) ("[E]ven if there [is] some evidence of behavior that qualifies as harassment, not all harassment or hostile behavior is actionable under Title VII. Only hostile and harassing behavior that is motivated by race, or ethnicity, or sex, or national origin, or religion, or race, [*sic*] or age is actionable."). Thus, to state a claim, at a minimum, a

plaintiff must allege facts that suggest that the complained-of conduct was motived by discriminatory animus. *Patane v. Clark*, 508 F.3d 106, 112 & n.3 (2d Cir. 2007) (explaining that although a plaintiff need not plead a *prima facie* case to survive a motion to dismiss, dismissal is nevertheless appropriate where the plaintiff "failed to allege even the basic elements of a discriminatory action claim."); *see also Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir. 2012) (summary order) (describing post-*Iqbal* pleading standards in Title VII actions).

While "there is no unbending or rigid rule about what circumstances allow an inference of discrimination," here, none of the factual allegations pleaded in the complaint even suggests that Inganamort was hostile to DeLaurencio because of her sex, race, or national origin. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). DeLaurencio alleges that Inganamort pushed her, left boxes in front of her filing cabinet, threw keys at her, called her "stupid," taunted her for failing a civil service exam and for taking an empty basket and left-over food home, posted facially-neutral newspaper cartoons on a public bulletin board, broke her ceramic angels, failed to record that she had taken a sick day, and left a cockroach in her desk, a chicken bone on her filing cabinet, two pennies in her lunch bag, and mugs insulting her intelligence in a shared kitchen. Even considering all of the incidents dating back two decades in the light most favorable to DeLaurencio, the sum of DeLaurencio's allegations supports only one conclusion: that Inganamort harbored personal enmity toward her. *See Wilson v. Family Dollar Stores of New York, Inc.*, No. CIV A CV-06-639 DGT, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008) (finding although behavior was "rude and unprofessional, it merely indicates personal enmity rather than discrimination and thus does not violate Title VII."); *Brodt v. City of New York*, 4 F.Supp.3d 562, 569 (S.D.N.Y. 2014) (granting motion to dismiss where "plaintiff's allegations of discriminatory motive reflected an uncomfortable workplace environment, as

opposed to discriminatory animus.") The facts do not suggest that Inganamort's facially-neutral, albeit rude, conduct was motivated by discriminatory animus. Although it is not dispositive that all of these incidents are facially neutral, there is simply no factual basis for inferring discriminatory animus. *Alfano*, 294 F.3d at 377 ("Facially neutral incidents may be included ... among the 'totality of the circumstances' that courts consider in any hostile work environment claim ... [if there is some] basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

The only allegation involving Inganamort that has anything to do with gender – that Inganamort once photocopied a picture of a fully-clothed black woman and apologized to DeLaurencio when she found the picture on the photocopy machine and told him it was offensive – was not directed at her. The mere fact that Inganamort once printed a picture of a black woman using the photocopier does not support the inference that the hostility that he exhibited towards DeLaurencio was motivated by discriminatory animus. DeLaurencio's repeated boilerplate allegations that Inganamort's conduct was motivated by discriminatory animus is not sufficient to state a cause of action under Title VII, since her conclusory statements are not supported by *factual* allegations. *Preston v. Hilton Cent. School Dist.*, 876 F. Supp. 2d 235, 244 (W.D.N.Y. 2012) (finding "boilerplate allegations that the defendants treated male same-sex sexual harassment complainants differently from female complainants" insufficient to plead Title VII claim). Nor does the fact that, in 1997, Chief Gallo propositioned DeLaurencio alter this Court's analysis. As explained above, DeLaurencio expressly limited the scope of the EEOC investigation to the hostile work environment *created by Inganamort*. None of DeLaurencio's factual allegations so much as suggest that Gallo's conduct was part and parcel of the hostile workplace created by Inganamort, or otherwise had anything to do with Inganamort's

campaign of harassment. DeLaurencio may well have been aggrieved by Inganamort's inappropriate and unprofessional conduct, but she has failed to plead that she was aggrieved on account of her sex, race or national origin. Accordingly, given that this Court is not "a court of personnel appeals," the case is dismissed. *Alfano*, 294 F.3d at 377.

## CONCLUSION

For the reasons set forth above, BCC's motion to dismiss is GRANTED and DeLaurencio's complaint is dismissed for failure to state a claim.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: May 29, 2015
Brooklyn, New York